IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANNE RODGERS,<br><br>  Plaintiff,<br><br>  v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, a New York Corporation; THE CALIFORNIA STATE AUTOMOBILE ASSOCIATION SHORT-TERM DISABILITY PLAN; THE CALIFORNIA STATE AUTOMOBILE LONG-TERM DISABILITY PLAN; and DOES 1 to 50, inclusive,<br><br>  Defendants.<br>_____/ | No. C 08-04599 CW<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR JUDGMENT |

Plaintiff Jeanne Rodgers moves for judgment on the administrative record on her claim for disability benefits under the Employee Retirement Income Security Act (ERISA). Defendants Metropolitan Life Insurance Company (MetLife), the California State Automobile Association Short-Term Disability Plan and the California State Automobile Association Long-Term Disability Plan cross-move for judgment on the administrative record. The matter was heard on July 16, 2009. Having considered oral argument and all of the materials submitted by the parties, the Court GRANTS Plaintiff's motion and DENIES Defendants' cross-motion.

FINDINGS OF FACT

Jeanne Rodgers worked for more than twenty years as an insurance sales agent for the California State Automobile

1 Association (CSAA).  In 2007, she began suffering from a variety of
2 medical problems and, on the advice of her doctors, stopped working
3 on November 17, 2007.
4     The CSAA maintains a Short-Term Disability Plan and a Long-
5 Term Disability Plan for its employees.  MetLife serves as the
6 claims administrator of the Plans and funds benefits that are paid
7 under them.  The Short-Term Plan provides benefits for employees
8 who are "disabled" based on the following definition:

> <u>Disabled</u> or <u>Disability</u> means that, due to
> Sickness or as a direct result of
> accidental injury:
>
> You are receiving Appropriate Care and Treatment and
> complying with the requirements of such treatment;
> and
>
> You are unable to earn:
>     more than 80% of YOUR Predisability Earnings at
>     Your Own Occupation from any Employer.

15 Administrative Record (R.) at 0024.  The Plan gives MetLife
16 "discretionary authority to interpret the terms of the Plan and to
17 determine eligibility for and entitlement to Plan benefits in
18 accordance with the terms of the Plan."  R. at 0053.  In order for
19 an employee to receive benefits, the Plan requires, "Proof of
20 Disability must be sent to Us.  When We receive such Proof, We will
21 review the claim."  R. 0034.  Proof is defined as, "Written
22 evidence satisfactory to Us that a person has satisfied the
23 conditions and requirements for any benefit described in this
24 certificate.  When a claim is made for any benefit described in
25 this certificate, Proof must establish: the nature and extent of
26 the loss or condition; Our obligation to pay the claim; and the
27 claimant's right to receive payment."  R. 0026.

2

1    According to her physicians, Rodgers suffers from extreme
2 anxiety, depression, migraine headaches, and severe pain in her
3 neck, low back, hips and legs. According to her psychiatrist, in
4 March, 2007, she fainted at work and was taken to the hospital.
5 The emergency room physician opined that her condition was stress-
6 related. R. 0248-50. On May 1, 2007, neurologist Dr. Ilkcan
7 Cokgor evaluated Rodgers. He noted that she had severe headaches
8 and related symptoms of nausea, vomiting, and photosensitivity. He
9 noted Rodgers experienced severe dizzy spells, loss of vision and
10 saw auras. Additionally, Dr. Cokgor noted that she suffered from
11 severe neck pain, and had "a lot of cervical muscle spasms."
12 Johnson Dec., Ex. B at PLT 0060-61. An MRI taken the same day
13 revealed multilevel degenerative disc disease within the cervical
14 spine. Id. at PLT 0065. Rodgers' symptoms intensified over the
15 course of 2007, and she was advised to stop work for approximately
16 six months to provide time for recovery.

17    After stopping work, Rodgers made a claim under CSAA's Short-
18 Term Disability Plan. As part of her application she provided
19 MetLife with a release which allowed it to obtain copies of all of
20 her medical records. R. 0299.

21    MetLife approved her claim for the period between November 15,
22 2007 and December 5, 2007. On December 4, 2007, MetLife notified
23 Rodgers that in order to continue to receive benefits beyond
24 December 5, 2007, she had to provide additional medical information
25 documenting her disability, including copies of the office visit
26 notes from her two most recent doctors' appointments, operative
27 test results, diagnostic test results, rehabilitation or therapy

3

notes, names and dosages of all medications, an assessment of her functional abilities and the date her physician anticipated she would return to work. R. 0295.

On December 4, 2007, MetLife contacted Rodgers' family physician, Dr. Meenal Lothia, to discuss her condition. On December 18, 2007, Dr. Lothia's office faxed to MetLife Rodgers' two most recent chart notes, which reported that she saw a psychiatrist weekly. The fax cover sheet also noted that Dr. Lothia's office had contacted Rodgers' psychiatrist with instructions to forward his records on to MetLife. R. 0284-86. Additionally, Dr. Lothia filled out a MetLife-provided form entitled, "Attending Physician Supplementary Statement" (APSS). On the form, Dr. Lothia noted that Rodgers suffered from anxiety and migraine headaches, and listed the medications she was taking. Dr. Lothia also noted that Rodgers was seeing a neurologist, Dr. Ilkcan Cokgor, and a psychiatrist, Dr. Nicholas Pappas, and provided contact information for both physicians. R. 0246. Rodgers claims that the form was faxed to MetLife on December 14, 2007, but MetLife maintains that it did not receive it until February, 2007, as part of the appeals process. In any event, it is undisputed that MetLife had the form before it issued its final denial of Rodgers' claim.

On December 20, 2007, MetLife wrote Rodgers a letter notifying her that it was denying her claim. R. 0292-94. The letter stated that the records provided by Dr. Lothia showed normal physical exam findings. Furthermore, it noted that the medical information regarding her mental health issues was based on self-reported

4

problems and that there "was no medical information from a mental healthcare provider in the form of a mental status exam, global assessment of functioning (GAF), psychiatric evaluation and current cognitive functioning evaluation, the degree of your anxiety and your response to current medication." R. 0292. The letter further stated, "For further consideration of benefits, you will need to provide information from your treating physician that will address the following: 1. Abnormal clinical findings with medical rationale as to why you are unable to perform functional job duties. 2. Current restrictions and limitations that reflect the clinical findings. 3. Any other testing or treatment records supporting severity of impairment and your inability to perform the essential duties of your job with or without restrictions." R. 0293.

After receiving the denial letter, Rodgers contacted her psychiatrist, Dr. Pappas, and asked him to send information to MetLife. Dr. Pappas submitted a report to MetLife dated January 16, 2007.[1] R. 0248-50. The report described her treatment history, including her former and current medications. Dr. Pappas noted that, despite medication, at the time of her most recent appointment, Rodgers' depression had increased, and her anxiety was at a high level. He also noted that she continued to have frequent headaches, and leg and back pain that rated a six to seven on a scale with ten being the highest. His diagnosis noted anxiety and depressive disorders, obsessive compulsive personality disorder, migraine headaches, fibromyalgia, low back and leg pain, and

---

[1] The report was submitted to MetLife in January, 2008, but was mis-dated January, 2007.

5

severe, overwhelming pressures at work. R. 0249. His report concluded that "Jeanne Rodgers is unable to return to work at this time. Her headaches, insomnia, depression and anxiety must be controlled before she can work effectively. Her prognosis is fair to good, based on her previous reintegration abilities. Duration at least 6 months since her response to date has been so slow." R. 0250.

On January 29, 2008, MetLife again denied Rodgers' claim. R. 0263-0265. Although its denial letter acknowledged Dr. Pappas' report, it repeated the language from the December 20, 2007 denial letter stating that there was "no medical information in the form of a mental status exam" to support her claim. The letter advised Rodgers that she could appeal the decision, and that she could submit additional documents relating to her claim that she thought were required in order for MetLife to give her appeal proper consideration.

Rodgers obtained counsel, and sent a letter appealing MetLife's decision on February 15, 2008. The letter attached several documents, including the APSS form, and a January 30, 2008 letter from Dr. Lothia. Dr. Lothia described Rodgers' diagnosis, including depression, anxiety, migraines, and insomnia, as well as severe pain in her neck and her right hip and leg. Dr. Lothia also noted that a May, 2007 MRI revealed extensive arthritis in her neck and back, causing tremendous pain. R. 0256. Dr. Lothia concluded that "as a result of this combination [of symptoms], it is my professional medical opinion that Mrs. Rodgers is unable to perform her job until May 15, 2008."

1    Although the APSS form noted that Rodgers was under the care
2 of Dr. Cokgor, a neurologist, and provided his contact information,
3 MetLife made no attempt to contact him.  It also made no attempt to
4 obtain the May, 2007 MRI scan mentioned in Dr. Lothia's letter.
5 Additionally, it did not ask Rodgers to send a copy of the scan or
6 other information from Dr. Cokgor.
7    In March, 2008, MetLife sent a copy of Rodgers' file to
8 several Independent Physician Consultants (IPCs).  The record
9 indicates that the reports were sent to Rodgers' treating
10 physicians for review and comment, and that copies were provided to
11 her counsel.
12    Dr. Marcus Goldman, a physician board-certified in psychiatry
13 and neurology, reviewed the file and spoke to Dr. Lothia.  He did
14 not speak to Dr. Pappas.  Dr. Goldman concluded that "the
15 information does not adequately support psychiatric functional
16 incapacity" and that Rodgers' work-related stress "would not be
17 sufficient to establish the presence of a severely debilitating
18 mental illness or disorder for which work would be precluded."  His
19 report did not address any of Rodgers' physical limitations.  R.
20 0226-27.
21    Dr. Ahmed Robbie, a physician board-certified in neurology,
22 also examined Rodgers' file and spoke to Dr. Lothia.  His report
23 concluded that Rodgers "has no physical or neurological limitations
24 that would preclude her from performing her job" but did not
25 address any of her psychiatric complaints.  R. 0220-23.
26    Dr. David Knapp, certified in internal medicine and
27 rheumatology, also issued a report analyzing Rodgers' claim.  He

United States District Court
For the Northern District of California

reviewed her file, but was unable to contact any of her treating physicians. He concluded that "medical records do not document clinically significant objective medical impairments that support functional limitations or reduction in ability to work full time." He did not address the impact of any psychiatric conditions, noting that they were addressed in the review completed by Dr. Goldman. R. 0209-11.

Finally, MetLife sent Rodgers' file to another neurologist, Dr. Leonid Topper. Dr. Topper reviewed the file and spoke to Dr. Pappas. Like the other IPCs, he did not contact Rodgers' neurologist or obtain a copy of her MRI scan. His report concluded, "From a neurological point of view, based on migraine headaches alone, the claimant's situation does not warrant a determination of continuous loss of functionality since typically migraine headaches would justify intermittent days off, but not a continuous lack of functionality." R. 0202-06. The report also noted, however, "that this assessment does not cover the claimant's functionality in regards to her psychiatric diagnoses." R. 0205.

On April 2, 2008, MetLife issued a final denial of Rodgers' claim. MetLife concluded that there was insufficient proof that Rodgers qualified under the Plan's definition of disability. The denial letter outlined her job duties as reported by her employer, and also provided an extensive summary of the IPC reports. It advised that she had exhausted her administrative remedies under the Plan.[2]

---

[2] In May, 2008, Rodgers filed another claim under the Plan (continued...)

8

CONCLUSIONS OF LAW

Pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Plaintiff seeks disability benefits under the Plan. This statute allows a participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Id.

I.  Standard of Review

Under Rule 52 of the Federal Rules of Civil Procedure, each of the parties moves for judgment in its favor on Plaintiff's ERISA claim. Under Rule 52, the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999)(en banc).

The standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan. Absent contrary language in the plan, the denial is reviewed de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). However, if "the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms," an abuse of

---

[2](...continued)
claiming disability because she underwent surgery to repair damage to the tendons in her elbow. MetLife denied the claim, finding it was an impermissible attempt to revive her earlier denied claim. Because the Court finds that MetLife abused its discretion in denying Rodgers' initial claim, it does not reach the issue of whether she should have also been able to claim disability based on the surgery.

9

discretion standard is applied.  Id. at 102.  Under this standard, the administrator's decision will be upheld if is reasonable and supported by substantial evidence in the administrative record as a whole.  McKenzie v. General Tel. Co. of Cal., 41 F.3d 1310, 1316-17 (9th Cir. 1994), overruled on other grounds, Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 n.2 (9th Cir. 2008).

Here, there is no dispute that the Plan confers discretion upon MetLife, and that MetLife operates under a conflict of interest.  In Abatie v. Alta Health & Life Insurance Co., 458 F.3d 955 (9th Cir. 2006) (en banc), the Ninth Circuit held that, in situations where "a plan administrator denies benefits and (1) the wording of the plan confers discretion on the plan administrator and (2) the plan administrator has a conflict of interest," a court should apply an "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest." Id. at 959.  To determine the level of skepticism to apply when a conflict exists, a court must consider "all the facts and circumstances."  Id. at 968.  As the court explained:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Id. at 968-69.  In Metropolitan Life Insurance Co. v. Glenn, ___

10

U.S. ___, 128 S. Ct. 2343 (2008), the Supreme Court affirmed that a plan fiduciary's conflict of interest should be "weighed as a factor in determining whether there is an abuse of discretion." Id. at 2350 (internal quotation marks omitted). The framework set out in Glenn is "similar to the one provided in Abatie." Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1024 (9th Cir. 2008).

II.  Consideration of Evidence Outside the Administrative Record

A district court may, in its discretion, "consider evidence beyond that contained in the administrative record that was before the plan administrator, to determine whether a conflict of interest exists that would affect the appropriate level of judicial scrutiny." Abatie, 458 F.3d at 970. Rodgers maintains that MetLife's decision should be viewed with skepticism because its failure adequately to investigate her claim demonstrates a conflict of interest.

When adjudicating a claim for benefits, ERISA administrators have a duty to adequately investigate the claim. Boonton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (1997). This requires that the plan administrator engage in "meaningful dialogue" with the beneficiary. Id. "If the administrator believes more information is needed to make a reasoned decision, they must ask for it." Id.; see also Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 538 (9th Cir. 1990) (burden is on the administrator to obtain information to make decision). As the Tenth Circuit has noted, ERISA fiduciaries "cannot shut their eyes to readily available information when the evidence in the record

11

1 suggests that the information might confirm the beneficiary's
2 theory of entitlement." <u>Gaither v. Aetna Life Ins. Co.</u>, 388 F.3d
3 759, 773 (10th Cir. 2004) <u>citing</u> <u>Boonton</u>, 110 F.3d at 1463-64.
4     In this case, MetLife was on notice, perhaps as early as
5 December 14, 2007, and certainly no later than February 15, 2008,
6 that Rodgers was under the care of Dr. Cokgor and had had an
7 abnormal MRI scan. <u>Compare</u> <u>Jordan v. Northrop Grumman Welfare</u>
8 <u>Benefit Plan</u>, 370 F.3d 869, 874 (9th Cir. 2004)(administrator did
9 not violate its duty to investigate a claim when it did not obtain
10 documents it did not know existed.)  Nonetheless, MetLife took no
11 steps to obtain the MRI or other records from Dr. Cokgor, or to
12 provide this information to its IPCs.  Although its December 20,
13 2007 and January 29, 2008 denial letters informed Rodgers that she
14 could send in additional information for consideration, the letters
15 contained a boiler-plate explanation of what MetLife believed was
16 missing.  They did not provide a description of the missing
17 information "in a manner calculated to be understood by the
18 claimant."  29 C.F.R. § 2560.503-1(g); <u>Saffon</u>, 532 F.3d at 870.
19 Therefore, the Court will consider MetLife's failure to communicate
20 with Rodgers clearly and its failure adequately to investigate her
21 claim in determining how much skepticism to apply in its review of
22 MetLife's denial of benefits.
23 III. Plaintiff's Claim for Disability Benefits
24     Like the defendant in <u>Abatie</u>, MetLife operates under a
25 structural conflict of interest: it is both the Plan administrator
26 and the funding source for benefits paid under the Plan.  As the
27 Ninth Circuit stated, "such an administrator has an incentive to

12

pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers." Id. at 966. In addition, as discussed above, MetLife failed adequately to investigate Rodgers' claims. Considering these facts, the Court will temper its review of MetLife's decision with a moderate amount of skepticism.

Rodgers argues that MetLife abused its discretion in denying her claim because it impermissibly disregarded the opinions of her treating physicians that she was unable to work due to a combination of symptoms including anxiety, migraine headaches, depression and severe pain in her neck, low back, hips and legs. MetLife counters that the IPCs it retained to review her claim found no proof of disability, and it is entitled to rely on their opinions. While MetLife need not "accord special weight to the opinions of a claimant's physician," it nonetheless may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

Here, Rodgers' treating physicians opined that the combination of her ailments rendered her unable to work. MetLife attempts to defeat Rodgers' claim by dividing her condition into discrete parts and arguing that, because the evidence for any single ailment did not support a finding of disability, Rodgers was not disabled under the terms of the Plan. The reports of MetLife's IPCs support this conclusion. Dr. Goldman, the psychiatric IPC, found that Rodgers was not disabled based solely on her psychiatric condition. Dr. Topper, the neurology IPC, concluded that Rodgers' migraine

13

1  headaches alone did not render her disabled, but noted that "this
2  assessment does not cover the claimant's functionality in regards
3  to her psychiatric diagnoses."  Similarly, Dr. Knapp deferred to
4  Dr. Goldman's report but did not address the statements of Rodgers'
5  treating physicians that the combination of mental and physical
6  symptoms prevent her from working.

7  In contrast, Rodgers' treating physicians take a more holistic
8  approach.  Essentially, they conclude that her illness is greater
9  than the sum of its parts, and that it is the combination of all of
10 the symptoms that prevents her from returning to work.  MetLife may
11 not arbitrarily refuse to credit these opinions.  Therefore, it
12 abused its discretion in denying Rodgers' claim.

13 Because MetLife denied Rodgers' claim under the Short-Term
14 Disability Policy, it never determined whether she qualified for
15 benefits under the Long-Term Disability Policy.  When, as here, a
16 plan provides discretionary authority to the administrator, and the
17 administrator has not yet had the opportunity to make a claims
18 decision, the court must remand the claim to the administrator for
19 consideration.  Saffle v. Sierra Pac. Power Co. Bargaining United
20 Long Term Disability Income Plan, 85 F.3d 455, 460-61 (9th Cir.
21 1996).  Therefore, Rodgers' claim for long-term disability benefits
22 is remanded to MetLife.

## CONCLUSION

24 Plaintiff's motion for judgment on the administrative record
25 (Docket No. 14) is GRANTED.  Defendants' cross-motion for judgment
26 on the administrative record (Docket No. 18) is DENIED.  The Court
27 finds that Plaintiff is eligible for disability benefits under

14

CSAA's Short-Term Disability Plan and orders Defendants to pay those benefits.  Plaintiff's claim for benefits under the Long-Term Disability Plan is remanded to MetLife.

Plaintiff shall submit a proposed form of judgment, approved as to form by Defendants.  After judgement enters, the Court will entertain a motion for attorneys' fees.  If Plaintiff is dissatisfied with Defendants' decision on her claim for Long-Term Disability, she may file a new complaint, which will be related to this case.

IT IS SO ORDERED.

Dated: 9/8/09

CLAUDIA WILKEN
United States District Judge

15